# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-60776-CIV-DIMITROULEAS/ROSENBAUM

ZENAIDA VARGAS o/b/o
ROBERT DIAZ,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

### *I.  INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Zenaida Vargas ("Ms. Vargas") on behalf of her minor son Robert Diaz ("Claimant") and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner").  The motions were referred to me pursuant to 28 U.S.C. § 636 and Magistrate Rule 1(c) and (d), Local Rules of the United States District Court for the Southern District of Florida. [D.E. 3 and 15].

This is an action seeking review of the final decision of the Commissioner denying Claimant's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381, *et seq.*  The cross-motions present the following issue: whether the proper legal standards were applied and whether there exists substantial evidence to support the determination by the Administrative Law Judge that Claimant is not disabled under the Social Security Act.  Under the limited standard of review that governs this case, this Court

concludes that substantial evidence does not support the ALJ's determination.   Accordingly, Plaintiff's Motion for Summary Judgment [D.E. 14] should be granted, Defendant's Motion for Summary Judgment [D.E. 16] should be denied, and the case should be remanded for further proceedings.

## II.   PROCEDURAL HISTORY

Claimant, through his mother, filed an application for her son's SSI benefits on July 28, 2003, under Title XVI of the Act.  (Tr. 12, 63-66).  Claimant alleged that he became disabled in April of 2001 due to attention deficit hyperactivity disorder ("ADHD").  (Tr. 63-69).  The Social Security Administration ("SSA" or "Administration") denied the applications initially and upon reconsideration. (Tr. 32-44).  Thereafter, a hearing was granted before an administrative law judge. On February 10, 2006, in Fort Lauderdale, Florida, Claimant appeared before Administrative Law Judge Jose G. Rolon-Rivera ("ALJ"), and testified, along with his mother, as to his impairments. (Tr. 227-282). Juliet Hananian, M.D., a pediatrician, also appeared and testified in her capacity as a medical expert.  (Tr. 227-282).  After consideration, on June 16, 2006, the ALJ found that Claimant was not under a "disability," as defined in the Act.  (Tr. 12-22).  Subsequently, Claimant requested review by the Appeals Council of the ALJ's unfavorable decision. (Tr. 121-127).  On March 30, 2007, the Appeals Council denied the request for review, thereby allowing the ALJ's decision to stand as the final decision of the Commissioner. (Tr.5-8).

On June 5, 2007, Ms. Vargas filed, on her minor son's behalf, the Complaint [D.E. 1] seeking reversal of the Commissioner's final decision.  The Commissioner filed an Answer to the Complaint [D.E. 11], and after a Briefing Order was issued, Claimant filed his Motion for Summary Judgment. [D.E. 14].   In response, the Commissioner filed his Motion for Summary Judgment and responded

to Claimant's motion [D.E. 16].  Thereafter, Claimant filed an Objection to Defendant's Motion for

Summary Judgment [D.E. 18].  The parties also appeared for a hearing on the cross motions for

summary judgment on April 23, 2008.  This matter is now ripe for consideration.

### III.   FACTS

#### A.   Background Facts

Claimant was born on October 15, 1993, and was nine years old at the time of the onset of

his claimed disability.  (Tr. 13, 63).  He allegedly became disabled on April 1, 2003, due to attention

deficit and hyperactivity disorder ("ADHD").[1]  Id.  At that time, Claimant was enrolled in third grade

at the Charter School of Excellence.  (Tr. 129-140, 172-178).   Claimant's behavior problems,

however, were first noted by his second grade teacher who suggested that Claimant see a psychiatrist.

(Tr. 135).  During his third grade year, Claimant began to display significant academic performance

problems, including low grades and a deficiency noted in his ability to give attention to details.  (Tr.

129-140).  In fact, Claimant's third grade teacher noted that Claimant was not meeting grade level

expectations.  (Tr. 140).  Also during his third grade year, Claimant saw his pediatrician, who

diagnosed him with ADHD.  (Tr. 150).

Due to noted "significant academic and attentional concerns," Claimant was referred to

school psychologist, Jilayne Watson ("Watson") for a psycho-educational evaluation.  (Tr. 172-178).

During various dates in March and April of 2003, Claimant underwent evaluation by Watson.  Id.

Watson noted that Claimant became frustrated easily by challenging tasks and went as far as to hit

---

[1]   Attention Deficit Hyperactivity Disorder or ADHD is a mental disorder characterized
by inattention (such a distractibility, forgetfulness, not finishing tasks, and not appearing to
listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining
seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn,
interrupting others, and excessive talking) or by both types of behavior. *See Dorland's Illustrated
Medical Dictionary* 547 (30th ed. 2003).

himself on the head when he had trouble answering questions.  (Tr. 173).  For the most part, Claimant was attentive to the tasks, but he became fidgety when tasks became more difficult.  *Id.* Testing using the Differential Ability Scale revealed a verbal IQ of 81, a spatial IQ of 77, and a non-verbal IQ of 87.  (Tr. 174).  The scores put Claimant in the low average-to-borderline intellectual functioning. (Tr. 13, 174).  Testing in academic achievement showed Claimant's performance in the areas of reading, math, and written language to be average and consistent with his grade placement.  (Tr. 13, 175).  Claimant demonstrated the most difficulty with comprehending written information, which also had an impact on his math reasoning.  (Tr. 175).

With respect to social and emotional functioning, Ms. Watson determined that Claimant demonstrated clinically significant difficulty with hyperactive behaviors, finding specifically that the behaviors hit an at-risk level while in the classroom setting.  (Tr. 176).  For instance, Ms. Watson stated that Claimant was restless, fidgeted with his hands and feet, failed to finish things he started, interrupted others, and was impulsive.  *Id.*  Ms. Watson noted that Claimant appeared to become frustrated when presented with challenging tasks and, as a result, became inattentive and off task.  (Tr. 177).  Overall, Ms. Watson opined that children such as Claimant who have cognitive difficulties are often at an increased risk for developing patterns of inattention and off-task behaviors.  (Tr. 177).  Ms. Watson referred Claimant to the school-based Eligibility and Program Placement Committee for educational planning.  *Id.*

On April 2, 2003, a licensed social worker from Smith Community Mental Heath Center ("SCMHC") evaluated Claimant.  (Tr. 165-171).  Claimant's mother reported problematic behaviors at school such as being disruptive in class, demonstrating poor social skills, being picked on by his peers, and dropping grades.  (Tr. 165).  In providing Claimant's family history, his mother noted that

4

Claimant had been a witness to and victim of his father's physical and verbal abuse and that Claimant has had little contact with his father. (Tr. 166). Further, Claimant's mother reported that her mother (Claimant's maternal grandmother) had been diagnosed with bipolar disorder and that Claimant's father has ADHD. (Tr. 166-167). His mother also explained that Claimant had behavioral problems at school consisting of calling out of turn, being disruptive, kicking the door when he felt upset or threatened, and fighting when he was being picked on. (Tr. 167). After examination, the social worker diagnosed Claimant with ADHD, noted a global assessment of functioning ("GAF") score of 47[2] and recommended that Claimant be evaluated by a psychiatrist for appropriate medication and Day Treatment services. (Tr. 170).

In July of 2003, a psychiatrist from SCMHC, Noel Cabrera, evaluated Claimant for his ADHD-related symptoms. (Tr. 156-164). Dr. Cabrera observed Claimant's increased hyperactivity, difficulty concentrating, inability to stay focused, and forgetfulness. (Tr. 156-157). Dr. Cabrera also noted that Claimant seemed anxious and sad and lacked motivation. (Tr. 157). During the evaluation, Claimant spoke about feeling dumb and preferring to stay inside because his peers called him "crazy, retarded, or stupid." *Id.* In taking Claimant's family psychiatric history, Dr. Cabrera noted that Claimant's maternal grandmother suffered from bipolar disorder and that his great-grandmother suffered from schizophrenia. (Tr. 159). Upon examination, although Claimant was fidgety, he was cooperative. *Id.* Claimant's memory was found to be intact and he was oriented in

---

[2]    Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. A GAF of 51-60 indicates that the individual has "[m]oderate symptoms. . . or moderate difficulty in social, occupational, or school functioning. . . ." *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders Text Revision,* 32-34 (4th ed. 1994). A GAF of 41-50 indicates either serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning. *Id.*

three spheres, but was distractible.  (Tr. 161).  Dr. Cabrera diagnosed Claimant with ADHD combined with anxiety and prescribed Concerta.[3]  (Tr. 161-162).

During fourth grade, Claimant's teacher completed a Teacher Questionnaire reflecting Claimant's overall functioning.  (Tr. 115-120).  The questionnaire revealed that Claimant's teacher perceived that Claimant had problems with the domain of attending and completing tasks.  (Tr. 116).  For example, the teacher rated Claimant as having "an obvious problem" with carrying out multi-step instructions, organizing his own things or school materials, and completing class/homework assignments.  *Id.*  Claimant's teacher also noted obvious problems with Claimant's ability to care for himself, particularly in the area of handling frustration appropriately, and responding appropriately to changes in his mood.  (Tr. 118).

In March of 2004, in response to a request by the State agency, Claimant underwent a psychological evaluation by Randy Levine, Ph.D.  (Tr. 185-189).  Claimant was referred to assist in determining eligibility for disability benefits due to ADHD and anxiety disorder.  (Tr. 185).  At that time, Claimant was enrolled in fourth grade and received counseling once a week at home from a therapist associated with SCMHC.  *Id.*  Claimant's mother also reported that he attended a day treatment center at SCMHC.  (Tr. 186).  There had been no consistent improvement in Claimant's acting out behaviors as his mother reported that Claimant continued to be easily frustrated, acted out aggressively, kicked doors and other students, had trouble following directions, fought with other children, and had other poor school conduct.  (Tr. 185).  Dr. Levine's behavioral observations reflected that Claimant was alert, cooperative, and oriented in three spheres.  (Tr. 187-188).

---

[3]    Concerta is a central nervous system stimulant prescription medication.  It is used for the treatment of attention deficit and hyperactivity disorder.  Concerta is taken to help increase attention and decrease impulsiveness and hyperactivity in patients with ADHD.  *See* http://concerta.net/concerta/assets/medication_guide.

Claimant's mood appeared to be appropriate, with no overt display of anxiety or depression. *Id.* However, Dr. Levine found Claimant's judgment to be a problem, noting that Claimant was impulsive. (Tr. 188). Ultimately, Dr. Levine diagnosed ADHD and anxiety disorder. (Tr. 188).

During his fifth grade year, Claimant continued to display behavioral and academic problems. In December of 2004, Claimant was suspended from school for two days because he punched another student, causing the other student's nose to bleed. (Tr. 128). Claimant also attended Compass Health Systems from February 2005 through April 2005, where he received mental health treatment due to his disruptive behavior and inattention. (Tr. 197-203). During treatment, Claimant was prescribed Concerta and his mother reported that Claimant was doing "OK." (Tr. 198).

In January and February of 2005, Claimant underwent a second psychoeducational evaluation performed by Susan Shetler, M.A., a school psychologist. (Tr. 204-213). In describing Claimant's background information, Ms. Shetler noted that Claimant was anxious, may have a mood disorder, and that his mother described Claimant as sometimes exhibiting manic behavior. (Tr. 205). Ms. Shetler reported that Claimant appeared to be irritable and labile, while at times he acted mad and disgruntled, but shortly thereafter would exhibit a big smile. (Tr. 206). Claimant was observed to hit himself in the head when unable to cope with presented tasks and was also in constant motion. *Id.* Ms. Shetler evaluated Claimant's intellectual functioning using the Wechsler Intelligence Scale for Children ("WISC-IV"). (Tr. 207). Claimant's scores revealed that he functioned within the low average-to-average range and his true I.Q. fell between 86 and 96. *Id.* Ms. Shetler noted that although Claimant took medication, he continued to exhibit behaviors characteristic of ADHD. (Tr. 209). She recommended a staffing to determine an appropriate educational program and to determine whether Claimant's conditions constituted a handicapping condition. (Tr. 210).

Claimant attended outpatient therapy with Suzette Stokes Sims, Ph.D, intermittently between February of 2005 and June of 2005.  (Tr. 215-225).  In her treatment notes, Dr. Sims noted Claimant's drastic mood swings, violence toward peers, and disruptive behavior.  (Tr. 220).  A notation of "R/O Bipolar" is also reflected in Dr. Sims' notes on more than one occasion.  *Id.* Progress Notes reveal that Claimant's attendance was inconsistent, with gaps in treatment.  (Tr. 219). In April of 2005, Dr, Sims wrote a letter to Claimant's mother stating that she assumed that Claimant's behavioral issues had improved since she had not seen him in five weeks.  (Tr. 216).  Dr. Sims again wrote to Claimant's mother in July of 2005 inquiring about Claimant and stating that she had not seen Claimant since June 2, 2005.  (Tr. 215).  Dr. Sims stated that she assumed that Claimant was doing well and that therapy was not necessary.  *Id.*

Claimant's last record of treatment occurred in February of 2006, shortly before the hearing in front of the ALJ.  Claimant presented to Compass Health Systems after an episode of aggressive behavior at school.  (Tr. 196).  The episode was reflected in a letter from Claimant's Guidance Counselor, Sharon Loos, to Claimant's mother.  (Tr. 144).  Ms. Loos explained that Claimant had thrown all of his books in the garbage and smashed his fist into the wall at school.  *Id.*  Ms. Loos asked Claimant to leave the classroom and Claimant refused.  *Id.*  Claimant eventually followed Ms. Loos to her office where he was described as uttering to himself.  *Id.*  Additionally, Ms. Loos stated that during their conversation, Claimant's eyes rolled back into his head.  *Id*.  After several minutes, Claimant looked up at Ms. Loos and said, "Who are you?  Where am I?  What's going on?  How did I get here?  Why am I here?"  *Id.*  Following the episode, Ms. Loos called Claimant's mother and expressed concern that Claimant could be suffering from an emotional handicap, mood disorder, or bipolar disorder.  (Tr. 146).  In response to Ms. Loos's offer to find help, Claimant's mother

explained that she did not have Medicaid, and, thus, Claimant did not qualify for any of the services offered by the school.  *Id.*

**B.**     **Testimony Before the ALJ**

On February 10, 2006, Claimant and his mother appeared and testified before the ALJ at an administrative hearing. (Tr. 227-283).  Claimant testified that he was a twelve-year-old, happy child who was repeating the fifth grade because he had failed the previous year.  (Tr. 230-231, 237).  His favorite subject was social studies, in which he claimed to get B's, and his least favorite subject was math, in which he claimed to get F's.  (Tr. 231-232).  His daily routine consisted of walking home from school with his sister, doing homework, and going to bed at eight o'clock.  (Tr. 235).  Claimant testified that he was responsible for cleaning the bathroom on Saturdays.  (Tr. 236).  He also testified that he took medication once a day, except for weekends when he took a break from the medication.  (Tr. 238-239).  Claimant stated that he believed that the medication sometimes helped him to "feel good" and focus.  (Tr. 239).

Further, Claimant stated that he felt happy at school , but considered himself to be one of the wild students in the class.  (Tr. 241).  He stated that he had two friends his age with whom he liked to ride bikes and skateboard.  (Tr. 241-242).  However, Claimant admitted that he had fought with other students in his class.  (Tr. 242).  Claimant also testified that he had difficulty sitting still in class and following directions.  (Tr. 242-243).  Once Claimant concluded his testimony, he left the room, and his mother, Ms. Zenaida Vargas, provided her testimony.  (Tr. 243).

Claimant's mother testified that her son was exaggerating about his school grades. (Tr. 243-244).  She testified that his grades were straight Fs, but then clarified that his highest grades were D's.  (Tr. 244).  Ms. Vargas explained that, in her son's mind, he believed that he was doing well

in school, but that his report cards and teachers indicated a different reality. (Tr. 244). When asked whether Claimant performed homework and house chores, his mother responded in the negative, stating that she had to reinforce him constantly. (Tr. 245-246). With respect to his behavior at school, Claimant's mother testified that he often giggled and joked around in class, but other times became very angry. (Tr. 246). Ms. Vargas indicated that her son had taken Concerta since 2003, but his behavior had escalated and became worse over time. (Tr. 247). As an example, Ms. Vargas stated that the past Tuesday at school, her son had an episode that frightened her. (Tr. 248). Claimant was very upset and then blacked out, forgetting the incident. *Id.* According to his mother, Claimant's guidance counselor indicated that she felt that Claimant was very confused and disoriented and was not pretending. *Id.* The guidance counselor also opined that Claimant may suffer from a mood disorder or be bipolar. (Tr. 146).

Ms. Vargas stated that her son did not like to take his medication, sometimes even hiding his pills in his pocket. (Tr. 249). Due to this behavior, his mother required Claimant to take the medication in front of her. (Tr. 249-250). With respect to Claimant skipping his medication on the weekend, Ms. Vargas indicated that Claimant's doctor left it up to her discretion whether to administer Claimant's Concerta on the weekends. (Tr. 258). His mother considered it a "treat" to allow Claimant to skip his medication on the weekends. *Id.*

Claimant's mother also contended that Claimant was aggressive and violent in school. (Tr. 250). For instance, Claimant had "busted" a student's nose and most recently, started throwing books in class. (Tr. 250-251). His mother attributed Claimant's violent behavior, at least in part, to comments from other students, calling him "crazy," "retard," and other similar names. (Tr. 253). Claimant attended special education classes, but according to his mother, even with

10

accommodations, Claimant's behavior continued to worsen.  (Tr. 251-252).  Claimant's mother

reported that his teachers described him as a sweet boy who has problems, and that his attention and

other behaviors were a constant problem.  (Tr. 254-255).  Claimant previously saw a psychiatrist

once a month, but his mother testified that after Claimant lost his eligibility for Medicaid, he stopped

the visits.  (Tr. 259).  Ms. Vargas stated that if her son were to be awarded Social Security benefits,

she would use the money to provide him with certain programs such as after-school learning

programs.  (Tr. 255).

Upon completion of Ms. Vargas's testimony, the medical expert, Juliet Hananian, M.D. ("Dr.

Hananian" or "the expert"), provided additional information to the ALJ.  (Tr. 261).  After reviewing

the evidence, Dr. Hananian diagnosed Claimant with ADHD, oppositional defiant disorder[4]

("ODD"), anxiety problems, and a learning disorder.[5]  (Tr. 263-264).  She also stated that although

she did not "agree completely," the recent psychiatric report indicated that Claimant suffered from

bipolar disorder.[6]  (Tr. 264).  The expert found Claimant's intellectual functioning to be below

_____

[4]  Oppositional Defiant Disorder is a psychiatric category listed in the Diagnostic and Statistical Manual of Mental Disorders where it is described as an ongoing pattern of disobedient, hostile, and defiant behavior toward authority figures which goes beyond the bounds of normal childhood behavior.  *See* www.http://en.wikipedia.org/wiki/Oppositional_defiant_disorder.

[5]  Learning Disability/Disorder refers to a group of disorders characterized by academic functioning that is substantially below the level expected on the basis of the patient's age, intelligence, and education, interfering with academic achievement or other functioning. Included are reading disorder, mathematics disorder, and disorder of written expression. *See Dorland's* at 549.

[6]  Bipolar refers to a category of mood disorders defined by the presence of one or more episodes of abnormally elevated mood, clinically referred to as mania.  Individuals who experience manic episodes also commonly experience depressive episodes or mixed episodes in which features of both mania and depression are present at the same time.  *See* www.http://en.wikipedia.orp/wiki/Bipolar_disorder

normal, but concluded that he was not retarded.  *Id.*

Dr. Hananian opined that although Claimant had certain marked limitations, he did not meet or equal any of the listed impairments.  (Tr. 265).  More particularly, the expert found Claimant to satisfy part A of the medical listing for ADHD, but found that he failed to satisfy at least two of the criteria set forth in part B of the listing which are required to meet the listing of ADHD.  (Tr. 265-266).  Instead, she found that Claimant met only one of the criteria set forth in part B – marked difficulty in maintaining concentration, persistence, or pace.  *Id.*  Next, Dr. Hananian opined that Claimant did not functionally equal a listed impairment.  (Tr. 267-270).  She determined that Claimant did not have any limitations in the domains of moving about and manipulating objects, and health and physical well-being.  (Tr. 268-269).  The expert also noted less than marked limitations in Claimant's ability to care for himself.  (Tr. 268).  Finally, Dr. Hananian opined that Claimant had functional limitations with respect to his conduct, school achievement, his interaction with other children, and acquiring and using information.[7]  (Tr. 268-269).  She did not specifically discuss whether Claimant had any limitations in the remaining domains of attending and completing tasks, and interacting and relating with others.  *Id.*

On cross-examination counsel for Claimant explained to the expert that she had the ability as a medical expert to find that the listing was equaled after taking into consideration Claimant's limitations as well as comments listed on various teachers' reports.  (Tr. 271).  However, Dr. Hananian responded that she would "like to go with whatever the book says."  *Id.*  She explained that Claimant's ADHD, anxiety, and oppositional defiant disorder would not make for listing equivalence

---

[7]     Although Dr. Hananian testified that Claimant was functionally limited in his conduct, in school achievement, and in interaction with other children, this testimony appears to be general in nature, since these areas are not included in the six domains to be considered in conducting a functional equivalence analysis.

because other than ADHD, the other problems were not mentioned in the book. (Tr. 273-274). Based upon the expert's explanation, counsel for Claimant questioned whether the expert understood that the analysis to determine whether Claimant equaled a listing was different from the analysis of determining whether a listing has been met. (Tr. 275-278). Dr. Hananian's ultimate opinion was that Claimant could be helped by additional medication for anxiety and family counseling. (Tr. 279). She also opined that if Claimant had ADHD and "another medical illness," he could qualify for benefits. (Tr. 281-282).

**C.**    **The ALJ's Determination**

On June 16, 2006, the ALJ rendered his unfavorable decision. (Tr. 9-24). The ALJ found that although Claimant suffered from severe impairments – ADHD, ODD, and anxiety, these impairments, alone or in combination, did not meet or medically equal a listed impairment. (Tr. 21). Thereafter, the ALJ found that Claimant did not have an "extreme" limitation in any domain of functioning, a "marked" limitation in two domains of functioning, and did not functionally equal the severity of the listings. *Id.*  Specifically, the ALJ determined that Claimant had less than marked limitations in the areas of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 18-19). The ALJ further found that Claimant had no limitations in the domains of moving about and manipulating objects, caring for himself, and health or physical well-being. (Tr. 20). Finally, the ALJ emphasized that Claimant's mother had not sought treatment for her son for most of 2005 and into 2006. (Tr. 21). The ALJ concluded that "[i]f the claimant were as disabled as [his mother] claims, she would have pursued services with a psychiatrist a long time ago." *Id*.  Based on all of these determinations, the ALJ ultimately found that Claimant was not disabled. (Tr. 22).

## IV.   STANDARD OF REVIEW

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

In determining whether substantial evidence exists, the Court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). The Court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision. *Miles v. Chater*, 84 F.3d at 1400. In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the Court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## V.   ANALYSIS

### A.   *The Sequential Evaluation*

A claimant has the burden of establishing that he or she is disabled under the Act. *See* 42 U.S.C. § 423(d)(5). Specifically, with regard to a minor,

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i); *see also* 20 C.F.R. § 416.906.  In order to determine whether a child is disabled, the ALJ must consider all relevant evidence, including medical evidence, test scores, school records, and information from people who know the child and can provide evidence regarding his or her functioning, such as the child's parents, caregivers, and teachers. 20 C.F.R. § 416.924a(a); *see also* 20 C.F.R. § 416.926a.

The SSA has adopted a three-step sequential test to determine whether a child is disabled. *See* 20 C.F.R. § 416.924; *see also, e.g., Wilson v. Apfel*, 179 F.3d 1276, 1277 n.1 (11th Cir. 1999). The first step is to determine whether the child is performing substantial gainful activity. 20 C.F.R. § 416.924(b). If not, the next inquiry is whether the child suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). If so, the final step is to determine whether the child's impairments meet, medically equal, or functionally equal an impairment listed in Part B of Appendix 1 of the Regulations.  20 C.F.R. § 416.924(d); *see also* 20 C.F.R. § 416.925(a)-(b).

In determining whether a child's impairment functionally equals a listing, the regulations require consideration of six "domains," which are "broad areas of functioning intended to capture all of what a child can and cannot do." 20 C.F.R. § 416.926a(b)(1). The six "domains" are as follows: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).[8]  Furthermore, within each of

---

[8]    In evaluating the ability to function in each domain, the following questions about whether the child's impairments(s) affects his or her functioning and whether the child's

these domains, there are various benchmarks that children should have achieved by certain ages. 20 C.F.R. § 416.926a(f)-(l); *see also, e.g., Shinn v. Comm'r of Social Security*, 391 F.3d 1276, 1277-1279 (11th Cir. 2004) (describing "the rather byzantine law governing determinations of disability in young children").

In order to "functionally equal" the listings, an impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R.§ 416.926a(d). A "marked limitation" is defined as a limitation that seriously interferes with the "ability to independently initiate, sustain, or complete activities," and is "more than moderate." 20 C.F.R. § 416.926a(e)(2)(i); *see also, e.g., Gibbs v. Barnhart*, Case No. 04-15285, 2005 WL 1052858, at *3 (11th Cir. May 5, 2005). Furthermore, this limitation is the equivalent of the functioning that would be expected "on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). [9]

---

activities are typical of other children the same age who do not have impairments will be considered:

    (i)      What activities are you able to perform?
    (ii)     What activities are you not able to perform?
    (iii)   Which of your activities are limited or restricted compared to other children your age who do not have impairments?
    (iv)   Where do you have difficulty with your activities-at home, in childcare, at school, or in the community?
    (v)    Do you have difficulty independently initiating, sustaining, or completing activities?
    (vi)   What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

*See* 20 C.F.R. § 416.926a(b)(2)(i)-(vi).

   [9]   Additionally, if the child is younger than 3 years old, a marked limitation will be found if the child is "functioning at a level that is more than one-half but not more than two-thirds of your chronological age when there are no standard scores from standardized tests in your case record." 20 C.F.R. § 416.926a(e)(2)(ii). Moreover, the regulations make special provisions for finding that a marked limitation exists in the sixth domain of functioning, "Health

On the other hand, an "extreme" limitation is reserved for the very "worst limitations." 20 C.F.R.§ 416.926a(e)(3)(i); *see also, e.g., Gibbs*, 2005 WL 1052858 at *3. It is defined as a limitation that "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities," but "does not necessarily mean a total lack or loss of ability to function." *Id.* Moreover, the regulations add that an extreme limitation is the "equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).[10]      The regulations explain, however, that no single piece of evidence will be dispositive of whether an individual has a marked or an extreme limitation in a

---

and physical well-being." 20 C.F.R. § 416.926a(e)(2)(iv). Specifically, it states that the ALJ may also consider a child to have a marked limitation in this domain if:

> . . . you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent" means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

*Id.*

[10]     For children under age 3, an extreme limitation will generally be found if the child is functioning at a level of one-half of the chronological age or less if there are no scores from standardized tests in the record.  *See* 20 C.F.R. § 416.926a(e)(3)(ii).  Moreover, as with marked limitations, there are also criteria in determining the presence of an extreme limitation in the "Health and physical well-being" category. *See* 20 C.F.R. § 416.926a(e)(3)(iv). Under this provision, an extreme limitation may be seen if the child is frequently ill because of the impairments or has frequent exacerbations of the impairment(s) that result in "significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation." *See id.* The regulation also notes that if the child had episodes or exacerbations of the impairment(s) which would be rated as "extreme," the "impairment(s) should meet or medically equal the requirements of a listing in most cases." *See id.*

17

domain. *See* 20 C.F.R. § 416.924a(1)(ii); *see also* 20 C.F.R. § 416.926a(e)(4)(i-ii). Test scores are considered together with the other information available about the claimant's functioning, including reports of classroom performance and the observations of school personnel and others. *See* 20 C.F.R. § 416.926a(e)(4)(i-ii).

###### B.   *Application of the Sequential Evaluation by the ALJ*

As a threshold matter, the ALJ determined that Claimant was an individual under the age of 18 who was enrolled in the fifth grade. (Tr. 13). The ALJ then applied the facts, as he found them, to the sequential framework. (Tr. 12-22). In doing so, the ALJ set out the record evidence, including the testimony presented, as well as the applicable law. *Id.*

The ALJ first found that Claimant had not engaged in substantial gainful activity during any part of the period under adjudication. (Tr. 15). Thereafter, he found that Claimant had ADHD which is a severe impairment because "the child has more than slight abnormalities and more than minimal functional limitations." *Id.* The ALJ also found that Claimant had the severe impairments of oppositional defiant disorder and anxiety. (Tr. 21). The ALJ next stated that he had considered Claimant's subjective complaints in determining whether Claimant met, medically equaled, or was functionally equivalent to one of the Listing of Impairments. *Id.* Ultimately, however, the ALJ ruled that the evidence failed to establish that Claimant's impairments met or medically equaled the severity of any impairment listed in Appendix 1 (Part B) of 20 C.F.R. Pt. 404, Subpt. P, including Listings 112.11 (ADHD) and 112.02 (Organic Mental Disorders). (Tr. 16). In making that determination, the ALJ evaluated "the interactive and cumulative effects of all medically determinable impairments, including any impairments that were 'severe' and/or 'not severe,' and considered, among others, "[t]he combined effects of multiple impairments on the child's

functioning." (Tr. 15).  The ALJ noted that no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment.  (Tr. 16).

The ALJ then proceeded to assess whether Claimant had an impairment, or combination of impairments, that was functionally equal to the listings and found that he did not. (Tr. 16-22).  In reaching this conclusion, the ALJ, in part, examined the record to determine how Claimant performed in the 'six domains' of functioning.  The ALJ concluded that because Claimant did not have an "extreme" limitation in one area of functioning or a "marked" limitation in two areas, the Claimant did not functionally equal, singly or in combination, any listed impairment.  (Tr. 21).

Specifically, in discussing the category of acquiring and using information, the ALJ found that Claimant had less than marked limitations and highlighted Dr. Hananian's testimony that in spite of his low average intellectual functioning, Claimant was able to perform age-appropriate work-related activities.  (Tr. 18).  Additionally, the ALJ found that Claimant had less than marked limitations in the domains of attending and completing tasks, and interacting and relating to others. (Tr. 19-20).  With respect to the domain of attending and completing tasks, the ALJ noted that Claimant had not received any formal mental health treatment during the past year and did not take medications on the weekends.  (Tr. 19).  Furthermore, concerning the remaining domains of functioning, the ALJ found that Claimant had no limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being. (Tr. 20).  In sum, upon reviewing all of the evidence, the ALJ found no marked limitations in three of the domains, and only less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 18-20).  Accordingly, the ALJ concluded that Claimant was not disabled for purposes of eligibility for Supplemental Security

Income payments under the Act.  (Tr. 21-22).

In forming his opinion, the ALJ stated that he accorded considerable weight to the Claimant's treating physicians.  (Tr. 18).  Among these treating physicians, the ALJ noted that psychiatrist Suzette Sims "ruled out bipolar disorder."  (Tr. 15).  The ALJ also emphasized that Dr. Hananian, the medical expert, testified that she did not believe that Claimant suffered from bipolar disorder. (Tr. 17).  Hence, in determining that Claimant was not disabled, the ALJ found that Claimant did not suffer from bipolar disorder.

**C.      _The ALJ's Decision Is Inconsistent With The Record And, Therefore, Is Not Supported By Substantial Evidence_**

**1.      Inconsistencies In The Record**

The ALJ's decision is inconsistent with the record in this case and, thus, this matter should be remanded for further proceedings.  In his opinion, the ALJ affirmatively stated that one of Claimant's treating psychiatrists, Suzette Sims, determined that Claimant did not suffer from bipolar disorder.  More particularly, the ALJ stated that Dr. Sims "ruled out bipolar disorder."  (Tr. 15). However, the record does not support such a finding.  Instead, Dr. Sims's notes regarding Claimant reflect notations stating "R/O Bipolar" and do not state that she had determined that Claimant did not suffer from bipolar disorder.  Apparently, the ALJ did not consider that the notation could reflect Dr. Sims's thought that a diagnosis of bipolar needed to be ruled out.  Significantly, during the hearing of this matter, regional counsel for Defendant admitted that typically, a notation of "R/O Bipolar" means that bipolar disorder was suspected, but not confirmed.  Indeed, counsel agreed that the ALJ's statement that bipolar had been ruled out appears to be an incorrect statement.

Additionally, the ALJ's statement that Dr. Sims had ruled out bipolar disorder is contradicted by the testimony of the medical expert, Dr. Hananian.  Indeed, Dr. Hananian testified that the recent

psychiatric report indicated that Claimant *suffered* from bipolar disorder.  (Tr. 264).  Again, this testimony is incongruent with the ALJ's statement that Dr. Sims determined that Claimant did not have bipolar disorder.  Instead, the medical expert believed that Dr. Sims had diagnosed Claimant as bipolar.  This is in direct contrast to the ALJ's opinion.

Likewise, the ALJ affirmatively stated in his opinion that Dr. Hananian found that Claimant did not suffer from bipolar disorder.  (Tr. 17).  However, a closer review of her testimony reveals that Dr. Hananian stated that she did not "completely agree" with Dr. Sims that Claimant suffered from bipolar disorder.  Hence, there appears to have been a question whether bipolar disorder applied to Claimant, but this question was not resolved.  The ALJ's conclusion that Claimant did not suffer from bipolar disorder is inconsistent with, if not belied by the record.  Indeed, a definitive finding by the ALJ that Claimant was not bipolar is contradicted by Dr. Sims's reports and the testimony of the medical expert.  Due to this inconsistency, the undersigned recommends that the matter be remanded for further proceedings.  *See Decker v. Harris*, 647 F.2d 291, 295 (2d Cir. 1981) (finding ALJ's conclusion erroneous when contradicted by direct evidence in the record).

### 2.    There Is A Need To Further Develop The Record

As a result of an unclear record and gaps in the evidence, the ALJ's conclusion that Claimant was not bipolar does not appear to be supported by substantial evidence.  Rather, it appears from the record that due to his misinterpretation of Dr. Sims's notes, the ALJ did not consider whether Claimant met the listing for bipolar, nor did the ALJ determine whether a diagnosis of bipolar would have changed the outcome of the medical equivalence analysis.  Here, particularly where the medical expert and ALJ came to different conclusions with respect to whether one of Claimant's treating physicians diagnosed bipolar disorder, it was necessary for the ALJ to develop the record further.

Moreover, there are other credible references to the bipolar issue that support further development of the record by the ALJ.

"It is well-established that the ALJ has a basic duty to develop a full and fair record." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also, e.g, Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (explaining that a hearing before an ALJ is not an adversarial proceeding). Indeed, the ALJ must develop the facts fully and fairly and probe conscientiously for all the relevant information, even where a claimant is represented by counsel. *See, e.g., Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). The ALJ's duty to develop the record stems partially from the fact that the hearing before the ALJ is not an adversarial proceeding. *See Id.*

It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary to make an informed decision. *See, e.g., Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir. 1988) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984)); *see also Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999). An ALJ, however, is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is unnecessary. *See, e.g., Wilson*, 179 F.3d at 1278. Additionally, case law requires that the claimant show some prejudice before a remand to the Commissioner for further development is ordered. *See Graham*, 129 F.3d at 1423. Ultimately, in evaluating whether it is necessary to remand, courts are guided by whether the record as a whole shows the kind of gaps in the evidence necessary to demonstrate prejudice. *Id; Crist v. Astrue*, 2008 WL 821934 (M.D. Fla. March 26, 2008).

I recommend a finding that the record was not sufficiently developed for the ALJ to fully evaluate Claimant's impairments and functional abilities. In this regard, the record as a whole shows

22

the kind of gaps in the evidence necessary to demonstrate prejudice.  First, although the administrative record included the opinion of Dr. Sims, her medical opinion is not clear.  On the one hand, there is testimony that Dr. Sims diagnosed Claimant with bipolar disorder, and on the other hand, the ALJ concluded that Dr. Sims ruled out a diagnosis of bipolar disorder.  (Tr. 17, 264).  Dr. Sims's reports therefore, did not enable the ALJ to make an informed decision and, thus, under the circumstances, it was necessary to order a consultative examination to evaluate Claimant's impairments.  *See*., *e.g., Fontanez ex rel.  Fontanez v. Barnhart*, 195 F.Supp.2d 1333, 1357 (M.D. Fla. 2002) (ordering remand in light of the ALJ's inability, based on limited testing and inadequate comparisons and score conversions, to determine the significance of claimant's test scores).  Here, failure to employ a medical consultant gives rise to the evidentiary gaps necessary to demonstrate prejudice. *See, e.g., Brown v. Shalala*, 44 F.3d 931 (11th Cir. 1995) (lack of medical and vocational documentation supporting an applicant's allegations of disability is prejudicial to claim for benefits).

During the hearing on this matter, counsel for Defendant refuted the contention that the ALJ failed to develop the record fully.  First, counsel argued that 20 C.F.R. § 416.919 is instructive on when a consultative examination is warranted.  Counsel asserted that, under the circumstances, the ALJ was not required to develop the record further by ordering a consultative examination.  Second, counsel argued that two state physicians presented record evidence and those physicians found that Claimant did not suffer from a disability.  Thus, counsel contends, any requirement to develop the record was satisfied.

With respect to the contention that section 416.919 does not require the ALJ to develop the record further, the Court turns to the language of that section.  Section 416.919 defines a consultative examination as a physical or mental examination or test purchased at the request and expense of the

Commissioner.  *See* 20 C.F.R. § 416.919.  The decision to purchase a consultative examination is made on a case-by-case basis in accordance with the provisions of Section 416.919a through 416.919f.  Section 416.919a further elaborates that the decision to purchase a consultative examination will be made after full consideration has been given to whether additional information is needed.  20 C.F.R. § 416.919a(a)(1).  The consultative examination is warranted when there is a "conflict, inconsistency, ambiguity or insufficiency in the evidence [that] must be resolved."  20 C.F.R. 416.919a(b)(4).  The examination is used to secure needed medical evidence that the file does not contain such as clinical findings and diagnoses.  In this case, contrary to Defendant's assertion, further development of the record via consultative examination is necessary.  Here, there is a "conflict, inconsistency, ambiguity or insufficiency" in the evidence that must be resolved in order for the ALJ to make an informed decision.

Moreover, defense counsel's argument that the records of the two state physicians satisfied any duty to develop the record cannot overcome this deficiency.  First, it is noteworthy that Drs. Shapiro and Clark did not physically examine Claimant.  Indeed, during the hearing, counsel for Defendant conceded that these doctors made their determinations of non-disability based on their review of the record and not an actual physical examination of Claimant.  Further, the time frame within which Drs. Shapiro and Clark made their determinations with respect to Claimant is significant.  As noted by Claimant's counsel during the hearing, the state physicians who completed disability evaluation forms, made their determinations before any issues relating to bipolar disorder surfaced.  Dr. Clark completed a disability form in September of 2003 and Dr. Shapiro completed a disability form in March of 2004.  However, the first time that bipolar disorder was mentioned as a potential issue was nearly a year later, when in February of 2005, psychologist, Susan Shetler,

stated that Claimant sometimes exhibited manic behavior and further opined that Claimant might have a mood disorder.  For these reasons, I respectfully disagree with counsel for Defendant that Drs. Shapiro and Clark's evaluations satisfy the requirement to develop the record.[11]

Nor was it reasonable for the ALJ to review Dr. Sims's reports and find that there was no need to further investigate whether Claimant was bipolar.  During the hearing, counsel emphasized that Dr. Sims's notes revealed that Claimant stopped seeing Dr. Sims in June of 2005.  Additionally, counsel noted that Dr. Sims's progress notes reflected that Dr. Sims wrote to Claimant's mother in July of 2005 and stated that she assumed that Claimant was doing well and that therapy was not necessary.  *Id.*  Counsel argued that Claimant's lack of treatment revealed that Claimant was doing well and, thus, not disabled.  This argument was also made by the ALJ in his opinion when he emphasized that Claimant's mother had not sought treatment of her son for most of 2005 and into 2006.  (Tr. 21).  Specifically, the ALJ concluded that "[i]f the claimant were as disabled as [his mother] claims, she would have pursued services with a psychiatrist a long time ago."  *Id.*

Due to Claimant's financial situation, however, I cannot agree that discontinuation of treatment accurately reflects that Claimant was doing well.  Instead, as the record reflects and as counsel for Defendant conceded during the hearing, Claimant lost his Medicaid benefits.  (Tr. 146, 259).  Indeed, Claimant's mother stated that as a result of the fact that Claimant was no longer eligible for Medicaid, she was limited in the services that she could provide for him.  *Id.*

Although failure to follow prescribed medical treatment without good reason precludes a finding of disability, poverty excuses noncompliance.  *Ellison*, 355 F.3d at 1275 (noting where ALJ relies on noncompliance as reason for denial of disability benefits and the record contains evidence

---

[11]     Even Dr. Levine examined Claimant in March of 2004, a year prior to any mention of bipolar disorder.

of Claimant's financial inability to comply with treatment, the ALJ is required to determine whether the Claimant was able to afford treatment). Here, Claimant discontinued treatment due to the fact that Medicaid had been terminated. Moreover, the ALJ acknowledged that the school psychologist noted that Claimant's counseling had been terminated due to "insurance problems." (Tr. 15). Because of these facts, it cannot be inferred that Claimant was not disabled due to lack of treatment. Likewise, it appears that Claimant was not able to present conclusive evidence to the ALJ as to whether he suffers from bipolar disorder as a consequence of being financially incapable of pursuing treatment by Dr. Sims.

Finally, aside from the notations in the record by Dr. Sims that she suspected bipolar disorder, other aspects of the record indicate that further development of the record is necessary with respect to this issue. Other record evidence such as Claimant's family history and his own behavior lend support to the suspicion of bipolar disorder. First, as noted by the intake forms from SCMHC and particularly by Dr. Cabrera, Claimant's maternal grandmother suffered from bipolar disorder and his great grandmother suffered from schizophrenia. (Tr. 159, 166-167). Moreover, school psychologist, Susan Shetler, stated that Claimant acted mad and disgruntled at times, but then shortly thereafter would exhibit a big smile. (Tr. 206). She noted that Claimant was described as exhibiting manic behavior and opined that Claimant may have a mood disorder. (Tr. 205).

Additionally, within days of the hearing before the ALJ, Claimant's guidance counselor memorialized concerns about Claimant's mental health. Following an incident where she removed Claimant from his classroom, the counselor noted that Claimant was uttering to himself. (Tr. 144). She also stated that during their conversation, Claimant's eyes rolled back into his head. *Id.* After a few minutes, Claimant asked the guidance counselor, "Who are you? Where am I? What is going

26

on? How did I get here? Why am I here?" *Id.* Following the episode, the counselor called Claimant's mother and expressed concern that Claimant could be suffering from an emotional handicap, mood disorder, or bipolar disorder. (Tr. 146).

Based upon these facts, this case falls within those limited circumstances where the ALJ had a duty to develop the record further. Not only is there a discrepancy between the ALJ's opinion and the record evidence, there is also evidence throughout the record tending to support Dr. Sims's apparent suspicion that Claimant may suffer from bipolar disorder.

Unlike other cases where an ALJ's decision was affirmed, the record here does not include the opinions of physicians who treated Claimant, where those opinions were sufficient for a decision. *See e.g., Wilson*, 179 F.3d at 1278 (finding no obligation by the ALJ to further develop the record where the record included opinions of several physicians sufficient for the ALJ's decision). Here, the record on the issue of bipolar disorder essentially ends with Dr. Sims's notes that she suspected, and needed to rule out, a diagnosis of bipolar (*i.e.*, "R/O Bipolar"). However, there was no definitive resolution of the issue. This is also not a situation where the ALJ attempted to develop the medical record, but Claimant failed to comply. *See, e.g., Ellison*, 355 F.3d at 1276. In this case, there is no way of knowing whether the evidence missing from this case would result in an award of disability benefits.

Defendant agreed during the hearing that if the record is developed and bipolar disorder is diagnosed, the listing that is particular to bipolar would need to be applied to determine whether Claimant is disabled. And, although the ALJ considered the listing for ADHD, he did not consider whether Claimant met the listing for bipolar, which has different criteria than that of ADHD. Even if Claimant is diagnosed with bipolar disorder and does not meet the listing, he could still be found

27

to be disabled under a medical equivalency analysis.[12]   It is well established that the ALJ must

consider the combined effects of Claimant's impairments.  *See Davis v. Shalala*, 985 F.2d 528, 533

(11th Cir. 1993); *see also, e.g., Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1533

(11th Cir. 1991) ("Where a claimant has alleged several impairments, the [Commissioner] has a duty

to consider the impairments in combination and to determine whether the combined impairments

render the claimant disabled.").  Furthermore, the combination of impairments must be considered

when the impairments separately are not severe.  *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir.

1985).  The ALJ is then required to make specific and well-articulated findings as to the effect of the

combination of impairments.  *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987).

In conclusion, the ALJ's opinion conflicts with the record and the medical expert's

testimony.  This inconsistency necessitates that the case be remanded.  Additionally, under the

circumstances, the ALJ did not fulfill his duty to develop the record fully.  Specifically, the record

is underdeveloped concerning whether Claimant actually suffers from bipolar disorder.  *Smith v.

Barnhart*, 435 F.3d 926 (8th Cir. 2006) (remanding case for further proceedings to allow ALJ to

further develop the record regarding extent of impairment from seizures).  The record as a whole

---

[12]    The Court recognizes that Claimant contends that he is entitled to summary judgment because the testifying medical expert failed to engage in an evaluation of medical equivalence.  During the hearing, counsel for Defendant agreed that the medical expert, Dr. Hananian, did not conduct a separate analysis of whether Claimant medically equaled a listing. Although it is troubling that the medical expert did not conduct a medical equivalence evaluation, this fact alone does not necessarily dictate that the case be remanded.  *See* 20 C.F.R.§ 416.927(f)(2) (providing that while an ALJ may ask for and consider the opinions of medical advisors on the nature and severity of a claimant's impairment and whether the condition(s) equals the requirements for a listed impairment, the additional requirement that testimony of a separate medical expert for the administrative hearing must be obtained is not imposed). However, since the case will be remanded for other reasons, the Court suggests that the ALJ direct the medical expert to conduct a medical equivalency analysis to ensure that the record is complete.

28

is incomplete and, thus, an evidentiary gap exists in the record which has resulted in prejudice sufficient to justify a remand. Therefore, I recommend a finding that the decision to deny Claimant benefits is not supported by substantial evidence. I further recommend that this case be remanded with instructions that it be returned to the Secretary for further proceedings consistent with this report and recommendation.

## VI.   CONCLUSION & RECOMMENDATION

For the foregoing reasons, I respectfully **RECOMMEND** that Plaintiff's Motion for Summary Judgment [D.E. 14] be **GRANTED**, that Defendant's Motion for Summary Judgment [D.E. 16] be **DENIED**, and that the case be remanded for further development of the record to determine whether Claimant suffers from bipolar disorder and if so, whether Claimant is disabled and, therefore, entitled to benefits.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

_____ **DONE AND ORDERED** in Fort Lauderdale Florida, this 31st day of July, 2008.

ROBIN S. ROSENBAUM
United States Magistrate Judge

29

cc:    Honorable William P. Dimitrouleas
        counsel of record